**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LEANNE DIMENT, on behalf of herself and all others similarly situated, | Case No.  1:23-cv-1173 |
| *Plaintiff,* | JURY TRIAL DEMANDED |
| -against- | |
| QUAD/GRAPHICS, INC. and RISE INTERACTIVE MEDIA & ANALYTICS, LLC. | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff Leanne Diment ("Plaintiff"), on behalf of herself and all others similarly situated, through her attorneys, Werman Salas P.C., upon personal knowledge as to herself and upon information and belief as to other matters, alleges as follows:

### INTRODUCTION

1.  Defendants Quad/Graphics, Inc. ("Quad") and Rise Interactive Media & Analytics, LLC ("Rise") (collectively "Defendants") maintain an employee wellness program (the "Wellness Program") under which employees who enroll in the Defendants' medical plan must either complete a biometric screening, which includes a blood test and cholesterol screening, or pay steep penalties in the form of increased weekly insurance premiums.

2.  The choice Defendants impose on their employees to either submit to an invasive medical examination or lose significant money, is barred by the Americans with Disabilities Act.

3.  The Americans with Disabilities Act ("ADA") protects employees from programs of compelled disclosure of sensitive and personal health information. Specially, under the ADA,

an employer may not require an employee submit to a medical examination and may not extract medical information from an employee unless the employee's decision is *voluntary*.

4. A wellness program is not voluntary if it penalizes employees who do not participate.

5. Even if the financial consequences of a wellness program are characterized as incentives for participation, rather than penalties for nonparticipation, a wellness program is not voluntary if the size of those incentives render the participation choice nonvoluntary.

6. Defendants have maintained the Wellness Program and imposed corresponding penalties for noncompliance.

7. Defendants required Plaintiff and other employees to either submit to a biometric screening and medical examination or surrender a substantial portion of their weekly paychecks.

8. Defendants' policy of imposing financial consequences on employees who did not submit to a medical examination and did not disclose sensitive and personal health information violates the ADA.

9. Defendants have maintained the Wellness Program notwithstanding substantial evidence that wellness programs do not improve employee health and do not change employee health care spending or utilization.

10. Plaintiff is one of Defendants' employees who participates in Defendants' medical plan. Plaintiff refused to provide medical information or submit to the required medical examination and as a result she has been assessed a $34.81 weekly penalty on her paycheck in the form of a premium increase.

11. Specifically, Plaintiff was charged $83.56 on her May 12, 2022 paystub for medical insurance. After the Defendants' deadline for participation in the Wellness Program passed, that weekly charge for medical insurance increased to $118.37 on Plaintiff's May 19, 2022 paystub.

12. Each weekly paycheck Plaintiff has received since May 19, 2022 has included the increased charge for medical insurance. The weekly penalties amount to over $1,800 in penalties assessed annually as a result of Plaintiff's decision not to submit to a medical examination at her employer's request.

13. Plaintiff files this case as a class action lawsuit, seeking to represent all individuals subject to Defendants' Wellness Program.

## **THE PARTIES**

14. Plaintiff Leanne Diment ("Diment") is a resident of Chicago, Illinois.

15. Diment has worked for Defendant Rise since June 1, 2016.

16. Quad acquired a majority ownership of Rise Interactive in March 2018.

17. Diment has worked for Defendant Quad since Quad acquired Rise in March 2018.

18. At all times relevant, Diment was an employee of Defendant Rise under 42 U.S.C. § 12111(4).

19. At all times relevant, Diment was an employee of Defendant Quad under 42 U.S.C. § 12111(4).

20. Quad is a limited liability company formed under the state of Delaware, with its principal place of business in Sussex, Wisconsin. According to Quad's 2022 10-k, Quad is a "worldwide marketing solutions partner" with over approximately 15,100 full-time employees in North America.

21. Rise is a wholly-owned subsidiary of Quad, with its principal place of business in Chicago, Illinois.

22. At all times relevant, Rise and Quad were covered entities and employers under 42 U.S.C. § 12111(2) and § 12111(5)(A) because they are engaged in an industry affecting commerce with 15 or more employees.

## JURISDICTION AND VENUE

23. Because Plaintiff brings this case under the ADA, 42 U.S.C. §§ 12101 *et seq.,* this Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1337, and 1343 and 42 U.S.C. §2000e-5.

24. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the Defendants are subject to personal jurisdiction in this District.

25. Defendants are within the personal jurisdiction and venue of this Court.

## PLAINTIFF'S EXHAUSTION OF ADMINISTRATIVE REMEDIES

26. Plaintiff filed a timely, class-based Charge of Discrimination with the EEOC on June 24, 2022, alleging that the Wellness Program violates the ADA.

27. The EEOC issued a Right-to-Sue letter that Plaintiff received on January 4, 2023.

28. By filing this federal action with 90 days of Plaintiff receiving the Right-to-Sue letter, Plaintiff has satisfied all administrative prerequisites under the ADA.

## FACTUAL ALLEGATIONS

**Employee Wellness Program**

29. An employee wellness program is a program administered as part of an employer-

sponsored group health plan or separately as a benefit of employment that requires employees to answer health questionnaires or undergo biometric screenings for health risk factors such as high blood pressure or cholesterol.

30. While employers sometimes tout wellness programs as tools for improving employee health and productivity, while reducing health care spending, research shows they do not create better measures of clinical heath such as body mass index, blood pressure, or cholesterol, do not affect employee absenteeism or job performance, and do not lower health care use of spending.[1]

31. Such programs are common among large employers, as one study found 72% of large firms that offer health benefits have some form of wellness program.[2]

32. In 2019, only 20% of large firms had an incentive for participation in a wellness program that exceeded $1,000 per year, while the average maximum incentive available was $783.[3]

**The ADA's Voluntariness Requirement**

33. Title I of the ADA is a federal civil rights law that prohibits employers from discriminating against individuals on the basis of disability. The law specifically restricts employers from obtaining medical information from applicants and employees, but allows them to make inquiries about employees' health or do medical examinations that are a part of a voluntary health program.

34. Specifically, under the ADA an employer is prohibited from "require[ing] a

---

[1] See https://hms.harvard.edu/news/do-wellness-programs-work
[2] https://www.kff.org/private-insurance/issue-brief/trends-in-workplace-wellness-programs-and-evolving-federal-standards/
[3] *Id*.

medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

35. The ADA includes a narrow exception to this general prohibition, allowing for medical inquiries and medical examinations when an employee's decision to participate is "voluntary." *Id*. § 12112(d)(4)(B). A non-voluntary inquiry or examination is, in itself, an act of discrimination under the ADA. *Id*. § 12112(d)(1).

36. In 2000, the EEOC explained in enforcement guidance that "A wellness program is 'voluntary' as long as an employer neither requires participation **nor penalizes employees who do not participate.**" EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), General Principles, Question 22 (July 27, 2000) https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#10 (emphasis added).

37. In 2016, the EEOC promulgated new regulations governing the voluntariness inquiry into a wellness program's compliance with the ADA (the "2016 Rules"). EEOC, Amendment to Regulations Under the Americans With Disabilities Act, Proposed Rule, 80 Fed. Reg. 21,659 (Apr. 20, 2015); EEOC, Genetic Information Nondiscrimination Act of 2008, Proposed Rule, 80 Fed. Reg. 66,853 (Oct. 30, 2015).

38. In the 2016 Rules the EEOC stated that an exam and inquiry related to a wellness program was "voluntary" so long as the "incentive available under the program . . . does not exceed . . . thirty percent of the total cost of [individual] coverage." 29 C.F.R. § 1630.14(d)(3) (2016).

39. The 2016 Rule regarding voluntariness is no longer in effect.

40. In *AARP v. EEOC*, 292 F. Supp. 3d 238, 240 (D.D.C. 2017), amending judgment in opinion at 267 F. Supp. 3d 14 (D.D.C. 2017), the U.S. District Court for the District of Columbia vacated the penalty/incentive production of the 2016 Rules as arbitrary and capricious, specifically finding the EEOC had not "considered any factors relevant to the financial and economic impact the rule is likely to have on individuals who will be affected by the rule." The court noted that the average 30% penalty—approximately $1,800 per year—"is the equivalent of several months' worth of food for the average family, two months of childcare in most states, and roughly two months' rent."

41. On December 20, 2018, consistent with the court's order, the EEOC withdrew the "incentive" portions of the 2016 Rules.

42. The remaining portions of the 2016 Rules, including the EEOC's "safe harbor" interpretation, remain in effect.

43. The statutory "voluntary" provisions and the agency's prior guidance and regulations, including the 2000 ADA Rule on voluntariness, also remain in place.

**Defendants' Medical Examination Requirement**

44. Defendants required that Plaintiff and other employees participate in medical examinations and inquiries that were not job-related or consistent with business necessity in violation of Section 102(d)(4)(A) of the ADA, 42 U.S.C. § 12112(d)(4)(A).

45. The medical examinations and inquiries were not voluntary and therefore were not permitted by Section 102(d)(4)(B) of the ADA, 42 U.S.C. § 12112(d)(4)(B) because employees who did not participate faced steep financial consequences for failing to participate.

46. The medical examinations required by the Wellness Program are administered and interpreted by health care professionals and administered in a medical setting using medical equipment.

47. Rise Interactive joined the Quad Benefits Program for the 2022 calendar year.

48. Quad determined the method and form of Plaintiff and other employees' benefits once Rise joined the Quad Benefits Program.

49. On October 21, 2021, Plaintiff and other employees of Defendants received an email referencing the "U.S Benefit Meetings this week" and attaching information about Quad's employee benefits. That email included an attachment "FAQ Open Enrollment November 2021" which explains that the amount of employees' health insurance premium will depend on whether they submit to a "biometric screening" which they describe as "a series of tests that check your blood pressure, cholesterol (HDL and LDL), blood sugar, body mass index and for cotinine (cotinine is a byproduct of tobacco use)." This email was sent from a Senior Vice President in Defendants' Rise's Chicago office to all employees in the Chicago Office.

50. The emails explained that after the first three months of 2022, employees' premiums would adjust based on participation in a biometric screening.

51. Plaintiff also received a "Notice Regarding Wellness Program" which also explained that "Additional incentives for medical plan participants of up to $250 may be available for employees and spouses who achieve certain health outcomes by completing a biometric, meeting with a Wellness Coach and completing a Well-being Activity."

52. Plaintiff also received a "Quad Health Plan Screening Form" which stated: "To maintain eligibility for either of Quad's medical plans, eligible employees and their spouses must

complete a biometric health screening every other year." *See* Exhibit A (Quad Health Plan Screening Form). Employees are instructed to "Take both pages of this form to your medical provider when you go for your health screening." *Id*. The form instructs a medical provider to input the employee's body mass index, blood pressure, total cholesterol, HDL cholesterol, triglycerides, triglycerides divided by HDL, LDL cholesterol, and hemoglobin A1C. *Id*. Furthermore, the medical provider is instructed to "please perform a Serum Cotinine Screening Test on your patient via blood draw." *Id*.

53. The information a health care professional must record during the employee medical examination is summarized in the below chart included in Exhibit A:

**MEDICAL PROVIDER INSTRUCTIONS**

Please ensure a value is submitted for ALL required biometrics. Failure to provide all values will result in an incomplete form, and you will not receive credit for completing your biometric screening.

| SCREENING DATE | FASTING? | HEIGHT (IN INCHES) | WEIGHT | BODY MASS INDEX (BMI) |
|---|---|---|---|---|
| ___/___/___ | ☐ YES  ☐ NO | | | |

| BLOOD PRESSURE | TOTAL CHOLESTEROL | HDL CHOLESTEROL | TRIGLYCERIDES | TRIGLYCERIDES DIVIDED BY HDL |
|---|---|---|---|---|
| | | | | |

| LDL CHOLESTEROL | HEMOGLOBIN A1C (NOT GLUCOSE) |
|---|---|
| | |

**TOBACCO TESTING REQUIREMENT**

Employees and spouses are required to complete tobacco testing to be eligible for lower medical plan premiums. Please perform a Serum Cotinine Screening Test on your patient via blood draw. Specimen can be submitted for testing to any external reference laboratory. Please indicate whether the test was positive or negative and record to the right.

If you are unable to perform cotinine testing, please direct your patient to make an appointment at Quest Diagnostics at my.questforhealth.com using "Quad" as the keyword. For additional assistance, he or she may contact MyQuad at 1.866.275.3737.

**REQUIRED RESULT**
☐ POSITIVE FOR COTININE
☐ NEGATIVE FOR COTININE

PRINT PROVIDER NAME (OR PROVIDER STAMP)

PROVIDER SIGNATURE    PROVIDER PHONE NUMBER

54. The Wellness Program biometric screen includes a blood draw and constitutes a medical examination according to general EEOC guidance.

55. Under EEOC guidelines, "[m]edical examinations include, but are not limited to

blood pressure screening and cholesterol testing." EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), General Principles, Question 2 (July 27, 2000) https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#10 (emphasis added).

56. Defendants use the information from the medical examination to assess their employees' blood pressure, blood sugar (AIC), LDL Cholesterol, Triglycerides/HDL, and Body Mass Index, and then impose higher premiums for individuals who do not fall within the ranges Defendants have identified as acceptable for those health measures. The company tells employees to "Know your numbers" as "They may count toward savings."

**Defendants' Imposition of Financial Penalties**

57. Plaintiff did not participate in the biometric screening portion of the Wellness Program.

58. Instead, Plaintiff specifically requested a waiver from the biometric screening requirement.

59. Defendants told Plaintiff that "Please note that you need to have biometric results before QuadMed will consider a waiver." Defendants recommended that Plaintiff "work with [her] provider to complete the biometric screen" as a condition for obtaining a waiver.

60. Defendants required, as a condition for obtaining a waiver, that a medical provider complete a Request for Medical Waiver form which specifically asks the provider about an employee's blood pressure, blood sugar (A1C), LDL cholesterol, triglycerides/DHS, body mass index, and cotinine.

61. Thus, Defendants did not offer employees any waiver from the requirement that they either submit to a medical examination or face increased health insurance premiums.

62. Plaintiff informed Defendants that she was not comfortable with an employer-required biometric screening.

63. On Plaintiff's May 12, 2022 paystub, Defendants imposed a charge for "MED Core Medical" of $83.56.

64. After Plaintiff failed to submit to a medical examination and submit the biometric screening form, on Plaintiff's May 19, 2022 paystub Defendants imposed a charge for "MED Core Medical" of $118.37.

65. This additional $34.81 was taken from Plaintiff's pay as a result of her decision not to participate in a medical examination requested by her employer.

66. An annual penalty of over $1,800 is a high price to pay for privacy and protection from an employer requiring an employee undergo an instructive examination and testing.

67. Similar penalties are imposed on Defendants' other employees who declined to submit to a medical examination.

68. Individuals who submit to the medical examination, rather than face penalties for opting out of the medical examination requirement, may still face financial penalties. Specifically, Defendants increased the premiums for individuals who after a medical examination, did not satisfy the Health Plan's key criteria ranges,.

69. The Wellness Program is not voluntary for purposes of the ADA because employees are required to participate in the program or face financial consequences.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action as a class action pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of all current and former employees of Defendants who were required to participate in the Wellness Program or otherwise face higher health insurance premiums since August 28, 2021.

71. The proposed class is so numerous that joinder of all members is impracticable.

72. The claims of the named Plaintiff are typical to the members of the proposed class. The named Plaintiff and other employees are all subject to Defendants' policy of requiring participation in the Wellness Program or otherwise face higher health insurance premiums.

73. Questions of law and fact are common to the class and predominate over any individual questions. Such common questions of law and fact include, but are not limited to, whether Defendants' acts as alleged herein violate the ADA; whether the medical examination and inquiries in the Wellness Program are voluntary, as required by the ADA; the nature and extent of the class-wide injury and the appropriate measure of damages for the Class; and whether declaratory/injunctive relief is warranted.

74. Plaintiff's claims arise from the same policy and course of conduct on the part of Defendants as those of the proposed Class.

75. Plaintiff will fully and adequately protect the interests of the Class. Plaintiff seeks the same recovery as the class, predicated upon the same violations of the ADA.

76. Plaintiff has retained counsel who are qualified and experienced in the prosecution of employee class actions.

77. Neither Plaintiff nor her counsel have interests that are contrary to, or conflicting

with, the interests of the class.

78. Pursuant to Fed. R. Civ. P. 23(b)(1)(A), the prosecution of this matter in hundreds of identical, individual lawsuits would create a risk of inconsistent results and would establish incompatible standards of conduct for Defendants.

79. Pursuant to Fed. R. Civ. P. 23(b)(2), Defendants have acted, or have refused to act, on grounds generally applicable to the proposed class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, with respect to the class as a whole.

80. Pursuant to Fed. R. Civ. P. 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of the controversy, The damages suffered by the individual class members are small compared to the expense and burden of individual prosecutions of this litigation. Prosecuting hundreds of identical, individual lawsuits would not promote judicial efficiency or equity. Class certification will eliminate the need for duplicate litigation.

### Count I
### Violation of the ADA
### (Brought on behalf of Plaintiff and the Class)

81. Plaintiff incorporates by reference all preceding allegations.

82. Defendants require medical examinations and make inquiries of employees in violation of 42 U.S.C. § 12112(d)(4)(A) and (B) because the medical examinations required under the Wellness Program are not "voluntary" components of an employee wellness program.

83. The testing required under the Wellness Program includes medical examinations within the meaning of the ADA because the required testing is administered by a health care professional or in a medical setting and seeks information about an individual's physical or mental impairment or health. The testing requires blood draws and cholesterol testing.

84. The medical examination is not voluntary because Defendants impose higher health insurance premiums – assessed on a weekly basis – on those who do not submit to medical inquiries and examinations.

85. Defendants imposed a higher health insurance premium on Plaintiff because she did not submit the required medical inquiries and examinations.

## DEMAND FOR TRIAL BY JURY

Plaintiff and the Class demand a trial by jury on all questions of fact raised by this Class Action Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other members of the proposed class, respectfully requests this Court:

A. certify the proposed class and appoint Plaintiff and her counsel to represent the class;

B. declare Defendants conduct to be in violation of Plaintiff's rights under the ADA;

C. enter an injunction prohibiting Defendants from continuing to impose weekly financial consequences on those who do not submit to the medical examinations required under the Wellness Program;

D. award compensatory damages;

E. award punitive damages;

F. award costs, including a reasonable attorney's fee; and

G. grant such other and further relief, as the Court may deem proper.

                                                                                Respectfully submitted,

Dated: February 24, 2023

                                                                                *s/Michael M. Tresnowski*
                                                                              **One of Plaintiff's Attorneys**

Douglas M. Werman - dwerman@flsalaw.com
Maureen A. Salas - msalas@flsalaw.com
Sarah J. Arendt - sarendt@flsalaw.com
Michael M. Tresnowski – mtresnowski@flsalaw.com
**WERMAN SALAS P.C.**
77 W. Washington St., Ste 1402
Chicago, IL 60602
Telephone: (312) 419-1008
Facsimile: (312) 419-1025